Moncure, J.
The first objection taken to the decree of the Circuit court is that the appellee has an adequate remedy at law, and that a court of equity has therefore no jurisdiction of the case. In answer to this objection it is contended that he has not an adequate remedy at law, first, because of the nature of the subject of the contract, being slaves; and secondly, because of the contingent and uncertain interest contracted for, being an estate for life or widowhood. I will consider these answers in their order. And first, as to the nature of the subject of the contract.
This is believed to be the first case in which the question has been distinctly presented for decision to this court, Whether a court of equity will specifically execute a contract for the sale or delivery of slaves, unless it be shown that they are of peculiar value, or that adequate compensation for them cannot be- obtained at law: Though there are several decisions of the court, which will be heréafter noticed, having an important bearing upon the question. The English books throw no light on the subject. The only English case I have seen in which the question was involved, is that of Pearne v. Lisle, Amb. R. 75 ; which was a suit to compel the delivery of certain negroes which had been hired by the defendant in the island of Antigua. In that case Lord Hardwicke is reported *411 to have said, “ As to the merits, a specific delivery of the negroes is prayed; but that is not necessary, others are as good; indeed in the case of a cherry-stone very finely engraved, and likewise of an extraordinary wrought piece of plate, for -the specific delivery of which bills w7ere brought in this court, they could not be satisfied any other way; their value arose on circumstances peculiar to themselves; but in other things, as diamonds, one may be as good as another.” His lordship rightly considered negroes as property; but seems not to have considered them as human beings, of greater peculiar value than “ a cherry-stone very finely engraved,” or “ an extraordinary wrought piece of plate.” Certainly that case can have no influence on the decision of this; which, must be decided on principle, and with such aid as may be derived from our own decisions, and those of our sister states in which the institution of slavery exists.
How stands the case on principle ? It is a general rule that a party cannot come into equity for relief if he has an adequate remedy at law; but if he has not, he is entitled, for that very reason, to come into equity. On this rule, the doctrine of specific performance rests. Courts of equity have long, if not always, exercised a general jurisdiction in the specific execution of contracts concerning real estate; “ not upon any distinction between realty and personalty, but because damages at law may not, in the particular case, afford a complete remedy.” Adderley v. Dixon, 1 Sim. & Stu. 607,1 Cond. Eng. Ch. R. 311, 2 Story’s Eq. Jur. § 717. Although in some cases of contract for the purchase of real estate a party may have an adequate remedy at law, yet he is not bound to resort to it, but may, at his election, sue in equity. Where such a contract is unobjectionable, it is as much of course for a court of equity to decree a specific performance, as it is for a court of law to give damages for the breach of the *412 contract. Hall v. Warren, 9 Ves. R. 605. The party need not show that the land is of peculiar value, or that he could not be adequately compensated in damages for the loss of it. It is enough that he so considers, and prefers to have the land in specie. And that he does so is conclusively shown by his suit for specific performance. His right to bring such a suit in all cases is founded on the nature of the subject, and on the advantage of having a general rule and the difficulty and inconvenience of forming exceptions thereto.
Generally an adequate remedy may be had at law for the breach of a contract concerning any other personalty than slaves; and therefore, as a general rule, a court of equity will not enforce the execution of such a contract. But sometimes an adequate remedy at law cannot be had for the breach of such a contract; and then, its specific execution will be enforced in equity. As, however, it would be presumed, from the general nature of such other personal property, that an adequate remedy may be had at law for the breach of a contract concerning it, the contrary ought to be made to appear in any case in which the specific execution of such a contract may be sought.
How let us apply the test to the peculiar species of property under consideration. Are slaves, in their very nature, such property as that an adequate remedy at law cannot generally be had for a breach of a contract to sell and deliver them ? If they are not, then the same principle applies to them which applies to other personal property. But if they are, then the same, or nearly the same, principle applies to them which applies to real estate; and in a suit for specific execution it will be presumed, from the very nature of the subject, and without any allegation to that effect, that an adequate remedy cannot be had at law. I am of opinion that they are. Slaves are not only property but rational beings; and are generally acquired with *413 reference to their moral and intellectual qualities./ Therefore damages at law, which are measured by the ordinary market value of the subject, will not generally afford adequate compensation for the breach of a contract for the sale of slaves. There is at least as much reason for enforcing the specific execution of a contract for the sale of slaves, as of a contract for the sale of real estate. The only difference between the two cases seems to be this, that while in the latter specific execution will always be enforced if the contract be unobjectionable and the suit be brought in due time, it will not in the former, if it appear that the slaves were purchased as merchandise, without reference to their peculiar value to the purchaser, or that the plaintiff is a mere mortgagee or other incumbrancer : in which case, as the slaves are to be sold at all events, damages at law assessed according to their) market value, would be adequate compensation.
Thus stands the case on principle, as it seems to me. Let us now see how it is affected by any decisions in this and other southern states. And first, in regard to the latter.
In South Carolina the subject has received fuller consideration than in any other state; and the law is now firmly settled in precise accordance with what I have stated. There is some apparent contradiction in the earlier cases, as might naturally be expected in the application of principle to a new subject. The line between real and personal estate in regard to the specific execution of contracts had been so long drawn, and was so well marked in the English books, that the courts were at first inclined to apply the same rule to slaves as to other personal estate. Accordingly, Farley v. Farley, 1 McCord’s Ch. R. 506, was decided on that principle. But in Sarter & wife v. Gordon, adm’r, 2 Hill’s Ch. R. 121, it was laid down as a general rule that a bill will lie for the specific delivery *414 of slaves as for the specific performance of a contract for the sale of land. In Horry v. Glover, Id. 515, the same rule is laid down, and many forcible observations are made to show the injustice, uncertainty and inconvenience of any other rule. It is also stated as an exception to the rule, that if a purchaser contract for slaves generally, with no view to any particular individuals, or as merchandise, to sell again, the remedy is at law. In Young v. Burton, 1 McMul. Equ. R. 255, the subject was fully considered by the Court of errors, and the cases of Sarter v. Gordon and Horry v. Glover were entirely approved. In reference to those cases the court saj, that although they were attended with the peculiar, or rather common circumstance that the slaves in controversy were family slaves, it was the intention of the court to lay down and establish a general rule. And in reference to Farley v. Farley, and the other early cases on the subject, they say, that those cases were decided without reference to that distinction which obviously exists between slaves and other chattels, and were based on a servile adherence to the English rule, and a total disregard to the principle on which it was founded. The whole opinion of the court in that case is very able, and I think conclusively demonstrates the correctness of the principle it affirms. There is nothing in conflict with it in any subsequent case. There has been, so far as I have seen, no subsequent case on the subject in the Court of errors. There have been several in the Court of appeals in equity; but they all recognize and follow Young v. Burton, which is regarded as finally settling the law on the subject in that state. Ellis v. Commander, 1 Strobh. Equ. R. 188; Bryan v. Robert, Id. 334; Sims v. Shelton, 2 Id. 221. The same doctrine prevails in North Carolina. Williams v. Howard, 3 Murph. R. 74. Also in Tennessee. Loftin v. Espy, 4 Yerg. R. 84; Henderson v. Vaulx & wife, 10 Id. 30. *415 Also in Mississippi. Murphy v. Clark, 1 Smeades & Marsh. 221; Butler v. Hicks, 11 Id. 78; Hull v. Clark, 14 Id. 187. In Georgia a different doctrine prevails; and it is held, in conformity with the English rule in regard to chattels, that to give a Court of equity jurisdiction to enforce a specific delivery of slaves, it is necessary to charge and prove peculiar circumstances ; as that they are family servants, a carpenter, blacksmith, wagoner, hostler, &c. Dudley v. Mattery, 4 Georgia R. 52, 65. Also, it would seem, in Alabama; Savery v. Spence, 13 Alab. R. 561; though I have not seen the case itself, the volume containing it being out of place in the library. The foregoing are all the decisions of our sister states, within my knowledge, which appear to have a material bearing on the subject. There may be others: But I think it may be safely concluded that the decided preponderance of authority to be derived from that source is in favor of the general jurisdiction of equity to enforce the specific execution of a contract to sell or deliver slaves.
I will now refer to such of our own decisions as seem to me to affect the question. They are all cases in which the question was, whether a court of equity would enjoin the sale of one man’s slaves under an execution against another man’s goods. In Wilson v. Butler, 3 Munf. 559, the affirmative of the question was held; the court being of opinion that the remedies of the owner at law are not in exclusion of a proceeding in equity, having for its object the retention of the property in specie. The case was expressly placed on the same ground, in regard to equitable jurisdiction, with a suit for specific performance; thus admitting, as it seems to me, that in such a suit to enforce the delivery of slaves, the jurisdiction of equity exists. Scott v. Halliday, 5 Id. 103, and Sampson v. Bryce, Id. 175, were cases of the same kind, and decided in the same way. In Bowyer v. Creigh, 3 Rand. *416 25, the plaintiff was an incumbrancer merely, and it was held that he had an ample remedy at law, and therefore no right to come into equity. What is said by Judge Carr in delivering the opinion of the court, on the general question of the jurisdiction of equity in such cases, is obiter dictum, and in conflict with subsequent decisions, which will be presently noticed. In Allen v. Freeland, Id. 170, which was decided before, though reported after Bowyer v. Creigh, the court was unanimously of opinion that the appellant claimed the slaves in controversy under a fraudulent sale, and therefore affirmed the decree dissolving his injunction. Three of the judges intimate their opinions on the question of jurisdiction in such cases. Judge Carr’s conforms with the views expressed by him in Bowyer v. Creigh, and takes the ground that peculiar value must be shown to give the court jurisdiction. Judge Green inclined to think that slaves ought prima, facie to be considered as of peculiar value to their owners, and not properly a subject for adequate compensation in damages, as land is considered to be to a purchaser; but that this presumption may be repelled, as in the case of a person purchasing slaves for the avowed purpose of selling them again. And he inclined to think it was repelled by the circumstances of that case; though he said it was not necessary to decide the case on that ground. Judge Brooke, after commenting on the peculiar nature and value of the property, said that in all such cases this court had exercised a restraining power, except a case in which, whatever may be the decision of it, the property is to be sold and the only controversy is as to the proceeds of sale; and he therefore thought the injunction was properly awarded; though upon the merits he concurred with the rest of the court in affirming the decree. In Randolph v. Randolph, 6 Rand. 194, the question, whether slaves are prima facie of such peculiar value as to give a court of *417 equity jurisdiction to restrain a wrongful sale of them under execution, was fairly presented for decision: And four out of the five judges concurred in opinion that they are. Judge Green said, “ This prima facie presumption may however be repelled by circumstances. As if the slaves were necessarily to be sold, (as in the case of their being pledged for the payment of debts,) and the question is between a creditor claiming under a specific lien, and one claiming under execution; or, if they were in the hands of the owner as a subject of traffic; in such cases the injury done to the owner by seizing and selling them, under an execution against another, would be precisely and accurately measured by their market value.” Judge Cabell said, “It should be regarded as a general rule, that the courts of chancery are bound to interpose whenever the slaves of one man are about to be sold to pay the debts of another. The exceptions to this general rule, whatever they may be, are to be brought forward and established in each particular case by those who claim the benefit of them.” The other two concurring judges were Brooke and Coalter. Judge Carr delivered a dissenting opinion, in which he adhered to his former views. In Sims v. Harrison, 4 Leigh 346, the case of Randolph v. Randolph was approved; and was declared as having determined, that in every case in which the owner of slaves wrongfully taken under execution applies to a court of equity to inhibit the sale of them, the court ought to award an injunction, and if the case be made out to give relief, though it be neither alleged in the bill, nor proved that the slaves have any peculiar value. The only remaining case, I believe, is Kelly v. Scott, 5 Gratt. 479, which follows the principle settled in the two cases last cited. The result of these decisions, it seems to me, is to maintain the general jurisdiction of equity to enforce the specific execution of a con *418 tract to sell or deliver slaves. There is at least as much reason for enforcing the specific delivery of slaves according to contract, as for protecting them from a wrongful sale under execution after their delivery. The reason in each case is, that the legal remedy is inadequate. But it is less so in the latter than the former case. In the latter, the party would generally have his choice of several remedies at law, as detinue or trover for the recovery of the property or its value, or an action on the indemnifying bond provided for by law in such cases. While in the former, his only legal remedy 'would be an action for damages. It can make no difference in principle, that in the latter he is already owner of the slaves, while in the former he has only contracted for the ownership. It is true that in the latter he may have formed an attachment to the slaves from long connection with them ; but that connection may have existed only for a day. A purchaser of slaves for his own use, looks to their qualities, and generally buys such only as will suit him. In each case, peculiar value will alike be presumed.
I am therefore of opinion, both upon principle and authority, that it may be laid down as a general rule, that a court of equity has jurisdiction to enforce the specific execution of a contract for the sale or delivery of slaves, though it be neither alleged in the bill nor proved that they have any peculiar value. The exceptions to this rule, whatever they may be, (as was said by Judge Cabell in Randolph v. Randolph,) are to be brought forward and established in each particular case, by those who claiiii the benefit of them. It is unnecessary to define them in this case, as it falls within none of them.
I am also of opinion that the appellee has not an adequate remedy at law, because of the uncertain and contingent interest contracted for. His remedy at *419 law is an action upon the covenant of the appellants to secure to him the services of the slaves in controversy during the lifetime of the female appellant. There is no safe or certain rule whereby the damages could be measured in such an action; and they could only be conjectured by the jury. If there were no other remedy, that, from necessity, would have to be resorted to, and the best attainable result arrived at, by the aid of tables of longevity or otherwise. After all, such result would probably be wide of the true mark. At least it must be admitted that such a remedy is inadequate; and that is sufficient reason for a suit in equity to obtain the very thing contracted for, which will do exact justice to both parties. If the covenant be construed to be for the use of the slaves during the widowhood of the female appellant, (which was the extent of her interest therein, and all that can be recovered of her in a suit for specific performance,) then it would be still more difficult to estimate the damages in an action at law, and there would be greater reason for a suit in equity. For the authorities on this branch of the case, see the notes to Cudder v. Rutter, in Leading Cases in Equity, 65 Law Libr. p. 529, 532-537; Batten on Contracts 234, 67 Law Libr. 138-144.
If the appellee could recover the slaves by an action of detinue, he would have an ample remedy at law and could not come into equity for relief. Armstrong v. Huntons, 1 Rob. R. 323, and oases therein cited. But he cannot maintain that action, at least for both of the slaves. The legal title was not vested in him by the covenant, which is merely executory. That he obtained, and for a short time held, possession of the girl, cannot take the case out of the jurisdiction of equity. He never obtained possession of the boy; and was soon dispossessed of the girl by the appellants, who now hold both against him. Even if *420 he could maintain detinue for the girl, (which, from peculiar terms of the contract, may be doubtful,) cannot for the boy; and may therefore sue in equity ^01’ The covenant is joint, and a court of equity having jurisdiction of the subject may give complete relief.
The jurisdiction of a court of equity being maintainable in this case on the ground of specific performance, and the party having a remedy at law though inadequate, the application, as in every such case, is addressed to the sound discretion of the court, 'which will enforce the contract if no good cause be shown or appear to the contrary. It was'insisted, in behalf of the appellants, that the contract in this case ought not to be enforced for several reasons. The first of which is, want of consideration. The appellee contends that the contract was founded both on valuable and meritorious consideration, and that either is sufficient to authorize the specific enforcement of a contract. The valuable consideration relied on is, the surrender of the lease. The appellants do not deny that this would be a valuable and adequate consideration, supposing that the female appellant had authority to make it — a question which will be presently considered ; but they deny that the contract was founded on that consideration, and aver that the lease was voluntarily surrendered. The lease was for the term of five years, and was surrendered at the end of one year. The surrender and the contract for the services of the two slaves in controversy bear date on the same day, and were executed at the same time. The inference from this fact, in the absence of any evidence to the contrary, is almost irresistible that the two instruments were dependent upon and in consideration of each other. The inference is supported and not opposed by other evidence. At the same time with the execution of the said surrender and contract two *421 other instruments were executed by the parties or some of them; one of the said instruments being the obligation of the appellant Mordecai A. Summers for the purchase money of the appellee’s interest in the real estate of Samuel Summers; and the other, an agreement between the said M. A. Summers and the appellee in regard to the crop on the demised premises. The latter recites that M. A. Summers, (who was evidently acting for his mother,) had bought out the appellee’s lease, which was then surrendered. This shows that the surrender was not voluntary, and no other consideration appears than the cotemporaneous contract for the services of the two slaves. The contract itself recites that it was executed “ for various considerations.” Being under seal, it would be an estoppel at law to a denial of the consideration ; and though not an estoppel in equity, it is yet prima facie evidence of the fact it recites against the parties thereto. In addition to all this, Bowyer the attesting witness to all these instruments, and who was present at their execution, being asked what were the various considerations mentioned in the covenant, said in his deposition, “ The consideration mentioned, as well as I can recollect, was in part the surrender of the lease agreement, and I supposed from the fact of said Bean’s wife being the daughter of Mrs. Summers.” And being asked by the appellants whether he could state positively that a surrender of the lease was part consideration of the covenant, said, “I was under that impression, though not expressly mentioned at the time, and that the land contract I think was also a part of the consideration.” Upon the whole, I think it manifestly appears that these acts and instruments were all parcels of one family arrangement; and mutually dependent upon, and in consideration of each other; and that the appellee would not have surrendered the lease but for the execution of the co *422 venant. I am therefore of opinion that the covenant was founded on valuable and adequate consideration: Which renders it unnecessary to consider the question, whether it is founded on meritorious consideration; or such as would authorize a court of equity to decree its specific performance.
Another reason assigned for not enforcing the specific execution of the contract is, that it would be a breach of trust; and that a court of equity will not aid any person in obtaining the performance of an agreement, which, if executed, would be a breach of the trust reposed in the other party. Batten 221, 67 Law Libr. 132. The supposed trust is created by the 7th clause of the will of Samuel Summers. It was contended in behalf of the appellee that this clause creates no trust.; or at least none that can be enforced; and only indicates the motive of the testator for giving the residuum of his estate to his wife during her widowhood; and Wallace v. Dold's ex'ors, 3 Leigh 258, and Stinson, ex'or, v. Day & wife, 1 Rob. R. 435, were relied on to sustain this view ; while Markham v. Guerrant, 4 Leigh 279; Perkins' trustee v. Dickinson, 3 Gratt. 335; Nickell v. Handly, 10 Gratt. 336, and 1 Jarm. on Wills 334-5, were relied on by the counsel for the appellant to sustain the contrary view. But I think it will be unnecessary to decide this question; being of opinion that another position taken on behalf of the appellee is sustainable, to wit, that even if the supposed trust exists, it would not be violated by the specific enforcement of the contract. The testator certainly intended to give his wife a considerable personal interest in the residuum of his estate during her widowhood — more than a child’s part, for life, to which he limits her interest in the event of her marrying again. And he certainly intended to give her during that period, if not the uncontrolled disposition, at least a very large discretion in the management of the sub *423 ject — as large as possible, consistently with the declared purposes of the supposed trust. It does not appear that the execution of the lease was a violation of the trust; but rather that it was reasonably supposed to be a convenient mode of executing the trust. The trustee was not bound to keep the property together, and cultivate the land herself; but might, if it was the interest of the parties concerned to do so, rent out the land and hire out the negroes. She might have leased out the trust subject for a term of years, even to a stranger. She leased it for five years to the appellee, her son in law, whose wife was one of the four children who -were living with her, and one of the objects of the supposed trust. In consideration whereof, he stipulated to pay all her debts, to support the family, to pay for the schooling of the two younger children, ahd provide them with books; in fine, to fulfill all the purposes of the trust during his term, and at the end of it to restore the subject in as good or better condition than when he received it. He also stipulated to pay to M. A. Summers, another and the oldest of the said four children, one-half of all the profits arising from the subject, as long as he continued “ taking an interest in the family.” It is not pretended that the consideration thus stipulated for, would not have been an ample rent for the property; and supposing the stipulations to be faithfully performed, it is impossible to regard the arrangement as a breach of trust. On the contrary, it seemed to be the best mode of effectuating the trust. All the family continued to live together in the mansion-house of the testator; the property was kept together, and under the management of the son in law; and, if there should be any profits, after paying the expenses of the operation and supporting the family, they were to be equally divided between the son and son in law. It turned out, how- • ever, that some disagreement arose between the par *424 ties; and they found it necessary to make a different arrangement. The consequence was, that .about a year the execution of the lease it was surrendered, the appellee sold his wife’s interest in the real estate to ^ie aPPe^an^ Summers, and the appellants executed the covenant .in regard to the two slaves in controversy. The question now is, Was the execution of that covenant a breach of the supposed trust ? If the trustee had a right to make the lease, she had a right to accept its surrender, and to pay a reasonable consideration therefor out of the trust subject, if required by the interest of the beneficiaries. It does not appear that the use of the two slaves for her life or widowhood, was an unreasonable consideration to pay for the surrender of the lease. But whether it was or not, the covenant was not a breach of trust, if the remaining trust subject, retained in the hands of the trustee, is ample for all the purposes of the trust; for the use during her widowhood of all beyond that, certainly belongs to her. It is not pretended that the remaining trust subject is not ample for those purposes. It would be strange, indeed, if she had so little individual interest in the subject, and so little power over it, that she could not part with the use during her widowhood of a boy and girl, 11 and 13 years of age, when she retained, subject to the purposes of the trust, all the other personal estate, including nine slaves and all the real estate. And that to.o- when her son, one of the beneficiaries, joined in the act of alienation, and the husband of another was the alienee; thus leaving only two of the beneficiaries who could have any cause to complain, and they, only if the subject retained should be inadequate to their support. It is not pretended that, if there had been no other consideration for the covenant than to make an advancement out of the personal estate to the wife of the appellee, the two slaves in controvei’sy would have been an excessive advance *425 ment, or such a one as it was not altogether proper to make, under the circumstances. She was one of the children for whom a comfortable home was provided by the trust, if trust it was. And when she married and left the maternal roof, it was nothing more than meet and right, and seems to be consonant with the purposes of the trust, that her mother, if she chose to do so, should make her a fair and reasonable advancement out of the trust subject; taking care to do no injustice to the remaining beneficiaries. In no view of the case, therefore, can the covenant be regarded as a violation of the supposed trust.
Another reason assigned for not decreeing the execution of the covenant is, that it was extorted from the appellants by the use of harsh and unjust means. The only foundation for this objection in the record is the evidence of Middleton, who testifies that the appellee said he had told the appellant Mrs. Summers, that he would rent out the farm and take the negroes off if she would not do something for him. This must have occurred while he held the lease; and the only tendency of the evidence is, to show that the covenant was executed in consideration, in part at least, of the surrender of the lease. The evidence is inconsistent with the answer of Mrs. Summers, who says the lease was voluntarily surrendered, and that the means by which the covenant was obtained were used after the surrender of the lease; although the surrender and covenant bearing date on the same day, and it is proved were executed at the same time. It is not pretended that any other means were then used than the cotemporaneous execution of both instruments; and it appears that none other were, from the evidence of the attesting witness. This objection therefore is unsustained.
I have noticed all the reasons assigned for not enforcing the specific execution of the covenant; and *426 considering them insufficient, I think the appellee is entitled to have that mode of relief.
Before closing this opinion it is necessary to notice an objection taken to the decree for want of parties. It was contended that the persons entitled in remainder to the slaves in controversy on the death or marriage of the appellant Mrs. Summers, are proper parties to this suit. I do not think so. The estate in remainder is not in controversy in this suit, and cannot be affected by the result of it. The rights of the remaindermen will be the same, whether the particular estate be held by the appellants or the appellee, and are amply protected by law in either case. A court of equity will interpose for their protection whenever they are endangered by the act of the particular tenant, in attempting or threatening to remove the subject out of the state or otherwise. But, consistently with those rights, the particular tenant has the same right of enjoyment of his éstate that any other has, including the right of alienation. Otherwise, it would always be necessary for remaindermen to join the particular tenant in an act of alienation of his estate.
I think the decree ought to be affirmed.
Allen, P. and Daniel and Lee, Js. concurred in the opinion of Moncure J.
Samuels, J. dissented.
Decree affirmed.