# CHARLESTON.

BUMGARDNER v. LEAVITT.

Submitted January 26, 1891.—Decided March 31, 1891.

1. SPECIFIC PERFORMANCE—CONTRACT—EQUITY.

　　As a general rule equity will not enforce specific performance of contracts for the delivery of shares of stock; but when a purchaser has bargained for or taken an option upon such shares, because they have to him a unique and special value, the loss of which could not be adequately compensated by damages at law, the chancellor in the exercise of a sound discretion may decree specific execution.

2. SPECIFC PERFORMANCE—CONTRACT—EQUITY.

　　Where such relief would be granted to the purchaser, were he to apply, the seller, who has given to the purchaser such preference or option, is entitled to like relief by reason of the operation of the principle of mutuality of right and remedy.

3. SPECIFIC PERFORMANCE—CONTRACT—EQUITY.

　　Where the remedy at law would be incomplete and inadequate,

because the court of law could not give a conditional or modified judgment and would be unable to preserve the benefit of the agreement to all the parties interested, equity has jurisdiction to enforce the agreement.

*Loomis & Tavener* for appellants, cited 3 Par. Cont. 366 n. X; Id. 363, 364; 2 Benj. Sales 1143, 1144; 1 W. & T. Lead. Cas. (Am. Ed. 1876) 1096; 1 Mor. Priv. Corp. § 218; Mit. & Ty. Pl. & Pr. 214; 123 Mass. 286; 35 Eng. L. & Eq. 433; 4 Mass. 595; 1 Ohio St. 350; 17 Gratt. 366; Pom. Spec. Perf. § 19; 25 W. Va. 525; Id. 540; 2 W. & T. Lead. Cas. 1118; 3 Pom. Eq. Juris. § 1405–7; 53 Ga. 414; 10 Bush. 54; 46 N. Y. 325; 48 N. Y. 585; 52 N. Y. 203; 76 N. Y. 365; 1 Whar. Com. § 282; 1 Sm. Lead. Cas. (7th Am. Ed.) 299; Cook Stock, § 338; 3 Pom. Eq. Juris. § 1402, n.; 32 W. Va. 278; 5 W. Va. 122; 2 Sto. Eq. Juris. § 718; 20 W. Va. 415; 24 W. Va. 765.

*B. Powell & O. Johnson* for appellees, cited 31 W. Va. 141; 1 Leigh 125; Id. 183; 5 Munf. 324; 41 N. J. Eq. 364; 31 U. S. 389; 1 Wheat. 179; 5 Cr. 262; 1 P. Wms. 629; 10 Ves. 292; 14 Ves. 205; 3 Cow. 445; 1 Paige, 244; 8 Paige 473; 2 N. Y. 408; 73 N. Y. 355; 5 W. Va. 122; 25 W. Va. 525; 7 L. R. A. 87; 11 Paige 414; 118 Mass. 279; 6 W. Va. 537; 125 Pa. St. 232; 3 Ark. 87; 2 Sto. Eq. Juris. 41; 10 Conn. 121; 22 Pick. 231; 7 En. L. & Eq. 229; 1 Pet. 299; Fry Spec. Perf. §§ 27, 53; 12 Sim. 189; 2 Sim. 304; 2 DeG. & Sm. 11; 1 DeG. M. & G. 596; 5 McL. 495; 1 Md. Ch'y Dec. 59.

LUCAS, PRESIDENT:

This suit originated by the filing of a bill in chancery by H. E. Bumgardner, a married woman, and H. F. Bumgardner, her husband, against C. P. Leavitt and others in the Circuit Court of Wood county. The female plaintiff alleges that the defendant, Leavitt, induced her to invest one thousand dollars in the steamboat General Dawes, the proposed cost of which was seven thousand five hundred dollars. It was understood that the boat was to be put in a joint-stock company, in which the plaintiff, H. E. Bumgardner, was to have shares in proportion to the money

she had advanced as aforesaid. The plaintiff exhibits with her bill an agreement as follows:

"This article of agreement, made and entered into this the 14th day of July, 1884, between C. P. Leavitt, county of Wood, and State of West Virginia, and H. E. Bumgardner of Hockingport, Athens Co., Ohio, witnesseth, that the said C. P. Leavitt, in case of misunderstanding, or not being able to agree, or in case of death of Herman Bumgardner, agent, said Leavitt agrees to take the said stock of Mrs. Bumgardner at not exceeding cost, or if boat depreciates in value, at fair cash valuation. The said Mrs. H. E. Bumgardner agrees to give said C. P. Leavitt the refusal over any other purchaser. The said stock referred to above is stock in the steamer General Dawes. [Signed] C. P. Leavitt."

There is further exhibited the following notice: "To Chas. P. Leavitt—Sir: I propose to sell you my stock in the Farmer's Trans. Co., in accordance with your contract of July 14, 1884, at cost, or, if the boat has depreciated in value, at its fair cash valuation. Your early attention is called to this matter, the contingency having arisen under which you bound yourself to take said stock. [Signed] H. E. Bumgardner, by H. F. Bumgardner, Ag't. March 31, 1887."

The bill supplements the above-written agreement, signed by C. P. Leavitt, by stating that it was a part of the consideration that the husband, H. F. Bumgardner, was to have regular employment on said steamboat, of which said C. P. Leavitt was to be master. It is further alleged that all of the interests, including the stock owned by Leavitt, (which was a large majority of it) as well as that owned by H. E. Bumgardner, was capitalized into a corporation known as the Farmer's Transportation Company, or conveyed to said company. The steamer was valued at seven thousand six hundred dollars at that time, and seven hundred and sixty shares of capital stock of the par value of ten dollars per share were issued, of which one hundred shares were given to said H. E. Bumgardner, and one and one third shares to her husband, in order that he might be represented in the company. It is further alleged that C. P. Leavitt

took charge as master, and pursuant to the agreement gave H. F. Bumgardner employment, but that they soon disagreed, and said H. F. Bumgardner was discharged.

Plaintiffs proceed to aver that since such disagreement they have at all times been ready to give said Leavitt the preference of purchasing said stock, and have urged him to buy said stock according to his agreement, but he has steadily and persistently refused to do so, until the 31st day of March, 1887, when the above notice was written and served. They charge that there has been no depreciation in the value of the boat, but that it has been increased in size and capacity at a large expense, and its value enhanced in consequence. It is further alleged that one E. W. Petty, who is made a defendant, had attached the one hundred and one and one third shares of stock in the Circuit Court of Wood county in an action at law against H. F. Bumgardner. It is further alleged that the plaintiffs were largely indebted to J. W. Arnold and L. H. Arnold, both of whom were made defendants, and that the female plaintiff executed a lien upon the said one hundred shares of stock to secure said indebtedness. By an agreement and compromise between the plaintiffs and said E. W. Petty his debt is reduced to four hundred and twenty two dollars, which it is agreed shall be paid him out of the proceeds arising from the sale of said one hundred and one and one third shares of stock; and by like agreement with J. W. and L. H. Arnold, they are to receive the residue of the proceeds of said sale as a compromise, and in full settlement of the indebtedness due them from the plaintiffs. Plaintiff H. E. Bumgardner, it is alleged has always been ready, and has offered, and now offers, to specifically perform the said agreement on her part, by assigning and transferring said one hundred and one and one third shares of stock free and unincumbered, as of the 31st day of March, 1887.

The prayer of the bill is that the court will declare the plaintiff to be entitled to a specific performance and execution of said agreement, with interest on the said amount from March 31, 1887; *second*, that the court will decree that the amount ascertained to be due said H. E. Bum-

gardner from said C. P. Leavitt may be paid over to said E. W. Petty and said J. W. and L. H. Arnold, as above set out; and *thirdly*, for all proper accounts and general relief.

The bill was demurred to by Leavitt, but the demurrer was overruled, whereupon C. P. Leavitt filed his answer, in which he admits the agreement as set out in the bill, so far as it goes ; but he denies it was ever understood or contemplated that the said H. F. Bumgardner should have the right, at any time he might thereafter see fit, to require respondent to buy the stock of said H. E. Bumgardner, and to require respondent to pay therefor the original cost, but in truth it was intended to give respondent refusal and right to buy said stock at any time, provided he paid therefor as much as any other bidder, and provided furthermore, that respondent so desired. He alleges that the boat is not worth more than two thousand five hundred dollars, about one third of what she cost at the time said stock was issued ; and that the present value of said one hundred and one and one third shares in the bill mentioned is not worth more than three hundred and thirty three dollars and thirty three and one third cents at the outside. He denies that the stock has ever been tendered him, or that either of the plaintiffs have ever proffered the same at anything like a fair cash valuation. He admits that on or about the —————day of July, 1887, he offered them eight hundred and fifty dollars for the stock, although he knew that they had immediately before that offered it to another party at eight hundred dollars. He alleges that it had been assigned by H. E. Bumgardner to Mrs. J. W. Arnold to secure payment of a debt, and the certificate was then held by one L. N. Tavener, as attorney for said Arnold, who had notified the secretary of the corporation, and requested a transfer on the books. Respondent sets out also that the certificate was incumbered by a lien of said E. W. Petty, and he pleads that the plaintiffs' had not title to said stock, and so could not carry out the agreement.

Respondent further alleges that his said offer of eight hundred and fifty dollars was made in good faith, and he was ever ready from the time he offered in 1887 to buy said

stock to take the same, but his offer was not accepted nor was there ever tendered to respondent the said stock at any time, nor could it be, since they had parted with the title. He denies that he ought in equity to be compelled to pay for the stock, which can not be delivered, and is incumbered to the full amount of its value.

J. W. Arnold and L. H. Arnold filed their joint and separate answer, in which they admit all that is said in the bill about the mortgage or pledge of the stock to them, and admit that they have agreed that out of the proceeds arising from the sale E. W. Petty should be first paid, and that they would accept the residue of the proceeds in full satisfaction of their lien, and that they have accordingly authorized L. N. Tavener, Esq., their attorney to execute their release in order that said H. E. Bumgardner may execute to said defendant C. P. Leavitt an unincumbered transfer of said one hundred shares of stock in fulfillment of said H. E. Bumgardner's contract on her part, as set out in Exhibit No. 1, of the bill.

E. W. Petty likewise answers, and admits all the averments of the bill as to his lien upon the stock by attachment, and also the agreement with reference to his payment out of the proceeds of sale.

A vast amount of testimony was taken, very little of which had anything to do with the case, the bulk of it seeming to be predicated upon some extraneous controversies, as to the earnings of the boat, and Leavitt's settlement with the corporation and stockholders.

On the 10th of December, 1888, the case came on to be finally heard, and the court decreed that H. E. Bumgardner was entitled to specific execution of the contract; that demand was made by her on 31st day of March, 1887; and that the one hundred and one and one third shares of stock were then worth eight hundred and sixty six dollars and sixty cents; and that the said C. P. Leavitt is decreed to pay that amount with interest from 31st day of March, 1887; aggregating the sum of nine hundred and fifty four dollars and seventy six cents, which he is to pay, with interest thereon from the date of decree. The money is to be distributed to the Arnolds and Petty in accordance with

their respective liens, and agreements with reference to the same.

The decree then proceeds to direct "that L. N. Tavener, is authorized in a writing filed in the papers in this cause to release the lien of said J. W. Arnold and L. H. Arnold upon one hundred shares of stock aforesaid, to execute said release of said lien, and, in case said L. N. Tavener shall fail or refuse to execute said release within ten days from this date, then Barna Powell, who is hereby appointed a special commissioner for the purpose, is authorized and directed to execute a release of the lien of said J. W. Arnold and L. H. Arnold, as aforesaid, upon the one hundred shares of stock held in the name of H. E. Bumgardner and filed with the papers in this cause, which certificate of one hundred shares, as well as the certificate of one hundred and one and one third shares now also in the file in this cause, are to be delivered to said C. P. Leavitt upon payment by him, or some one for him, to the defendants Petty and Arnolds and plaintiffs, the sum hereinbefore decreed by him to be paid."

Leave was given the plaintiffs to sue out execution. From this decree the defendant Leavitt has appealed to this Court.

The first and pivotal question to be decided in this case is whether the court of chancery had jurisdiction to decree specific performance. If not, the bill should have been dismissed on demurrer. In the first place regarding the defendant Leavitt, as having for a consideration obtained the refusal of, or, as we may call it, the option on, this stock, could he have maintained a bill for specific performance against Mrs. H. E. Bumgardner in case she had refused to let him have the stock, and had insisted on selling it to some one else? This is an important question, because if such relief could be granted to the purchaser were he to apply, the seller, who has given the purchaser such preference or option, is entitled to like relief by reason of the operation of the principle of mutuality of right and remedy. The general doctrine upon this subject is thus stated by Mr. Pomeroy: "It is not then sufficient in general that a valid and binding agreement exists, and

that an action at law for damages will lie in favor of either party for a breach by the other; the peculiarly distinctive feature of the equitable doctrine is that the remedial right to a specific performance must be mutual." See *Moore* v. *Fitz Randolph*, 6 Leigh, 175.

This is a general rule, namely, that the right to a specific execution of a contract, so far as the question of mutuality is concerned, depends upon whether the agreement itself is obligatory on both parties, so · that upon the application of either against the other the court would grant a specific performance. *Duval* v. *Myers*, 2 Md. Ch'y 401. Says Mr. Pomeroy: "It is a familiar doctrine that if the right to the specific performance of a contract exists, at all, it must be mutual. The remedy must be alike attainable by both parties to the agreement." Pom. Spec. Perf. § 165.

In the present case it appears that the defendant, Leavitt, being the owner of about three fourths of the stock in a steamboat, entered into an agreement with a married woman with reference to one thousand dollars of the same stock. It is true that the contract was signed by him alone. The circumstance, that it was signed by him alone, is not material, since it is admitted by both parties that she entered into the contract, and was to be bound by it. Wat. Spec. Perf. §§ 268, 270. Neither is the fact that she was a married woman material in this State, since, by our married woman's act, which went into operation in 1869 (see Code, c. 66) a married woman may not only take and hold personal property, such as stocks, but, being such a stockholder, she may vote the same in any organized company; consequently she had the right of disposal and the power to sell or contract to sell. It is also true that, according to her statement, personal services entered into a part of the consideration of the contract, and it is a rule almost universal that a contract for personal services can not be enforced against the party promising such services, and hence for the want of the requisite mutuality specific execution will not be enforced against the opposite party unless the services have been actually performed, and the contract to that extent been executed, as was the case here. Pom. Spec. Perf. § 310.

These obstacles being disposed of, we may inquire: If Mrs. Bumgardner had persisted in selling this stock to a third party, contrary to her agreement, could Leavitt have asked the court of chancery to interfere by injunction, and compel her to transfer the stock to him upon payment of the price stipulated in the agreement? The question of specific performance of contracts for the delivery of stock is frequently treated by the text-writers in an empirical and unsatisfactory manner, as if there were something peculiar in this character of personal property, which renders it impossible to classify it under any general rule. Mr. Fry, for example, does not hesitate to say positively that a contract for the sale of stock will not be specifically enforced, although he afterwards admits that railway shares form an exception. Fry, Spec. Perf. §§ 24, 27. Mr. Pomeroy's treatment of the subject is equally unsatisfactory. See Pom. Spec. Perf. §§ 17–19.

The true principle would seem to be that, as a general rule, courts of equity will not enforce specific performance of contracts for the delivery of shares of stock, but when a purchaser has bargained for such shares, or taken an option upon them, because they have for him a unique and special value, the loss of which could not be adequately compensated by damages at law, the chancellor, in the exercise of a sound discretion, may decree specific execution. This principle we find laid down and insisted upon in the more recent work of Mr. Waterman (1881.) "The same principles," he says, "govern in contracts for the sale of stock as in the sale of other property—that is, if a breach can be fully compensated in damages, equity will not interfere; while it will do so when, notwithstanding the payment of the money value of the stock, the plaintiff will still lose a substantial benefit, and thereby remain uncompensated. If a contract to convey stock is clear and definite, and the uncertain value of the stock renders it difficult to do justice by an award of damages, specific performance will be decreed." Wat. Spec. Perf. § 19.

Among the many other cases cited in support of this proposition is the leading case of *Doloret* v. *Rothschild*, decided by Sir John Leach, vice-chancellor, in 1824, 1 Sim. &

S. 590, in which it is said that a bill will lie for the specific performance of a contract for the purchase of government stock, where it prays for the delivery of certificates which give the legal title to the stock. There are many other cases, however, both in England and America, which sustain the correct principle as laid down above, but which it is unnecessary to cite.

In the present case the purchaser of the refusal of or option upon the stock in the steamboat was dealing for an article which he could not go upon the market and buy, and which no one could deliver to him but the holder, with whom he bargained. The shares of stock evidently had for him a peculiar value, which could not be compensated by mere damages, such as would be recovered at law. Their possession would enable him to control the company and to retain his position as master of the vessel. For the same reason, therefore, that a contract for railway shares will frequently be specifically enforced, *e. g.*, whenever such shares are being purchased for the purposes of organization and control, I think a court of equity would have interfered in this case in favor of C. P. Leavitt, had he filed a bill praying for its intervention. It follows, therefore, upon the ground of mutuality of remedy and reciprocity of obligation, that such a bill could be maintained by Mrs. Bumgardner.

There is another ground quite as apparent as that stated above, and that is that the legal title to this stock had passed into the hands of a third party, who is properly made a co-defendant. In the case cited above of *Doloret* v. *Rothschild*, 1 Sim. & S. 590, the vice-chancellor remarks: "I consider also that the plaintiff, not being the original holder of the scrip, but merely the bearer, may not be able to maintain any action at law upon the contract, and that, if he has any title, it must be in equity." So in the present case the plaintiffs are in a situation in which a court of equity sees its way clearly to administer complete and adequate remedial justice to all parties interested, whereas, if they were remitted to a court of law, if relief could be afforded at all, it could only be done by resorting to several actions, perhaps no less than three. Upon the general principle,

therefore, of avoiding circuity of action, and affording relief where the remedy at law is inadequate, it was proper for the court of equity to exercise its jurisdiction. Whenever the remedy at law would be incomplete and inadequate because the court of law can not give a conditional or modified judgment, and would be unable to preserve the benefit of the agreement to all the parties interested, equity has jurisdiction to enforce the agreement.

In the case of *Summers* v. *Bean*, the general principle is thus declared by Judge MONCURE (13 Gratt. 412 :) "Generally an adequate remedy may be had at law for the breach of a contract concerning any other personalty than slaves, and therefore, as a general rule, a court of equity will not enforce the execution of such a contract. But sometimes an adequate remedy at law can not be had for the breach of such a contract, and then its specific execution will be enforced in equity." As it was said in *May* v. *Le Claire*, 11 Wall. 218, in order to oust the equity jurisdiction, the remedy at law must be " as effectual and complete as the chancellor can make it." The same principle is recognized by all the text-writers. See Fry, Spec. Perf. § 18 ; Pom. Spec. § 29. Mr. Waterman says tersely : "If, however, the remedy at law would be wholly inadequate or impracticable specific performance will be decreed." Wat. Spec. Perf. § 17.

For these reasons, we think there was no error in overruling the demurrer to the plaintiffs' bill. Upon the merits, although there was, as we have said, a great deal of unnecessary testimony taken, the plaintiffs' case might have rested, and no doubt did rest, upon the testimony of the defendant C. P. Leavitt himself. Out of the one hundred and sixty eight questions propounded to him, of which some were frivolous, and nearly all impertinent, he is asked by the one hundred and third question whether he did not offer Mrs. Bumgardner eight hundred and fifty dollars for her stock, in order to get rid of Bumgardner, to which he replies : "Yes; I wanted to get rid of him. Here is one of the clerks right here who asked him what he would take for it at different time." 10th question : "Did you not make a proposition to buy the stock on account of your

obligation under that contract? Answer. Oh, yes; several times. I guess the clerk here knows that I made offers at different times through Mr. Ritchie; and Mr. Baringer can testify to the same thing." The defendant further testifies that these offers were made in March, 1887, or a little after that time, and that the negotiations would have been concluded, except for some trivial and inconsequential dispute about matters foreign to the subject-matter.

To take the defendant, therefore, at his own word, and fix the value of the stock at a price only differing by a few dollars from what he himself offered, with interest from the time of his offer, was a judgment of the Circuit Court of which he has no right to complain, and we think, therefore, that the decree complained of should be in all respects affirmed.

Affirmed.